**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ELECTRONICALLY FILED
JUN 18, 2026
U.S. DISTRICT COURT
Northern District of WV

**PAUL B. KENNY**,

Plaintiff,

v.

Civil Action No.: **5:26-cv-122 (Bailey)**

Judge:

**EVAZ PRIME, INC**., a Pennsylvania corporation; **AHMED ABDI SALIMIN**, an individual; **SEDGWICK CLAIMS MANAGEMENT SERVICES, INC**., a Tennessee corporation; **JOHN DOE DISPATCHER(S)**, individual(s) unknown; **JOHN DOE SAFETY DIRECTOR(S)**, individual(s) unknown; **JOHN DOE MAINTENANCE CONTRACTOR(S)**, entity or entities unknown; **JOHN DOE BROKER(S)**, entity or entities unknown; and **JOHN DOE DEFENDANT(S)**, individuals or entities unknown,

Defendants.

---

**COMPLAINT**

---

**NOW COMES** Plaintiff Paul B. Kenny, individually, by and through his undersigned counsel, and for his Complaint against defendants Evaz Prime Inc., Ahmed Abdi Salimin, Sedgwick Claims Management Services, Inc., and John Doe dispatcher(s), safety director(s), maintenance contractor(s), broker(s), and individuals or entities unknown, states:

This case turns on a simple principle: a truck driver must not move into a lane that is already occupied by another vehicle. On the night of December 20, 2025, Defendant Ahmed Abdi Salimin was operating an 80,000-pound tractor-trailer westbound on Interstate 70 in Ohio County, West Virginia. Paul Kenny was already in the right lane, traveling lawfully alongside the tractor-trailer, when Salimin moved his truck into that lane and struck the driver's side of Mr. Kenny's vehicle.

The safety duties that protect the public from commercial trucks are not complicated. Keep a proper lookout. Do not change lanes unless the target lane is clear. Confirm the lane is clear before you move. Drive with the care that an 80,000-pound machine demands. Defendant Salimin violated every one of them.

Defendant Evaz Prime Inc. was Salimin's employer and motor carrier. It bore independent responsibility for ensuring those duties were honored. It failed to qualify, train, and supervise Salimin adequately, and sent an inadequately prepared driver onto a public interstate highway. Before December 20, 2025, Paul Kenny had no significant medical history and no complaints prior to the collision. After the collision, Paul Kenny suffered genuine, serious injuries — diagnosed by physicians, confirmed by objective neurological testing, and directly caused by this crash. He sought treatment not because of litigation, but because he was hurt and needed help. The collision also destroyed his family's only vehicle.

Defendant Sedgwick Claims Management Services, Inc. was assigned to handle the property damage claim. Sedgwick knew Paul Kenny was a person with disabilities, was sixty-four years old, and was a man of limited financial means who could not afford to go without transportation. Sedgwick refused to pay what West Virginia law plainly required. It conditioned payment of undisputed amounts on his surrender of separate legal claims. It exploited his disability-driven economic vulnerability to coerce him into waiving rights he was entitled to keep.

Paul Kenny brings this action to hold accountable those who violated the duties that existed to protect him.

## PARTIES

1. Plaintiff Paul B. Kenny is a resident and citizen of Bridgeport, Belmont County, Ohio, residing at 201 Scotts Lane, Bridgeport, Ohio 43912.

2. Defendant EVAZ PRIME INC. ("EVAZ PRIME") is a corporation with its principal place of business at 107 Langhorne Avenue, Langhorne, Pennsylvania 19047.

3. At all times relevant herein, EVAZ PRIME was a motor carrier registered with the Federal Motor Carrier Safety Administration under U.S. DOT Number 3469087 and MC Number 1134917, authorized for interstate property transportation.

4. EVAZ PRIME operated 50 power units and 55 drivers and reported mileage of 6,525,500 miles in 2025.

5. Upon information and belief, EVAZ PRIME's common carrier operating authority was served with an involuntary revocation notice on January 28, 2025, with an effective date of February 28, 2025, as reflected in FMCSA records.

6. EVAZ PRIME's BIPD/Primary liability insurance was carried by National Specialty Insurance Company, Policy No. CAR3700000151, with coverage limits of $1,000,000, effective November 26, 2025, with a cancellation date of February 10, 2026.

7. Defendant Ahmed Abdi Salimin ("Salimin") is a resident and citizen of the State of Arizona, residing at 2525 N. Balnoa Avenue, Apartment 1108, Tucson, Arizona 85705.

8. At all times relevant herein, Salimin held a Class A commercial driver's license issued by the State of Arizona.

9. At all times relevant herein, Salimin was an employee, agent, and/or statutory employee of EVAZ PRIME, acting within the course and scope of that relationship.

10. Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick") is a corporation organized under the laws of the State of Tennessee with its principal place of business at 8125 Sedgwick Way, Memphis, Tennessee 38125.

11. Sedgwick may be served with process through its registered agent, Corporation Service Company, 808 Greenbrier Street, Charleston, West Virginia 25311.

12. Sedgwick was assigned to administer the property damage and bodily injury claims arising from the December 20, 2025 collision on behalf of EVAZ PRIME's insurer under Claim No. 4A2601LJXDL-0001.

13. The true names and identities of Defendants JOHN DOE DISPATCHER(S), JOHN DOE SAFETY DIRECTOR(S), JOHN DOE MAINTENANCE CONTRACTOR(S), JOHN DOE BROKER(S), and JOHN DOE DEFENDANT(S) are presently unknown to Plaintiff.

14. These defendants are sued under fictitious names pursuant to applicable rules of civil procedure.

15. Upon ascertaining their true identities, Plaintiff will seek leave to amend this Complaint.

16. At all times relevant herein, the John Doe defendants were agents, employees, independent contractors, brokers, and/or co-venturers with EVAZ PRIME, acting within the course and scope of that relationship.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over Counts I through IV under 28 U.S.C. § 1332(a).

29. Plaintiff Paul B. Kenny is a citizen of Ohio.

30. Defendant EVAZ PRIME INC. is a citizen of Pennsylvania.

31. Defendant Ahmed Abdi Salimin is a citizen of Arizona.

32. Defendant Sedgwick Claims Management Services, Inc. is a citizen of Tennessee.

33. No defendant is a citizen of Ohio.

34. The amount in controversy exceeds $75,000, exclusive of interest and costs, based upon Plaintiff's medical expenses, lost wages, diminished earning capacity, permanent injuries, pain and suffering, property damage, and other damages.

35. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (see ¶¶28–35) and also has supplemental jurisdiction over Count V pursuant to 28 U.S.C. § 1367(a), as that claim arises from the same case or controversy as Counts I through IV.

36. Defendants EVAZ PRIME and Salimin caused tortious injury in West Virginia and operated a commercial motor vehicle through this state in interstate commerce, subjecting them to the personal jurisdiction of this Court.

37. Sedgwick conducted claims adjustment activities in connection with a collision occurring in West Virginia, subjecting it to personal jurisdiction here.

38. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Ohio County, West Virginia, including the collision on Interstate 70 West near mile marker 6.00.

## FACTUAL BACKGROUND

### *A. The Collision*

39. On December 20, 2025, at approximately 8:26 p.m., a collision occurred on Interstate 70 West near mile marker 6.00, in Ohio County, West Virginia.

40. Weather conditions at the time were clear.

41. The roadway surface was dry asphalt.

42. Interstate 70 West at that location is a two-way, divided highway with two westbound lanes of travel.

43. The posted speed limit was 55 miles per hour.

44. Plaintiff Paul B. Kenny was operating his 1989 Buick Electra 4-door sedan, VIN 1G4CW54C9K1636907, bearing Ohio license plate KLF2741.

45. Mr. Kenny was traveling westbound in the right lane of Interstate 70.

46. Mr. Kenny was traveling at or below the posted speed limit.

47. Mr. Kenny was properly restrained by his shoulder and lap belt.

48. Mr. Kenny was operating his vehicle lawfully in all respects.

49. The crash report reflects no contributing circumstances, violations, or improper actions attributed to Mr. Kenny.

50. Defendant Salimin was operating a 2021 Freightliner tractor-trailer, VIN 3AKJHHDV2MSMM0739, bearing Pennsylvania license plate PT751X1.

51. The tractor-trailer bore signage identifying EVAZ PRIME INC. as the carrier, USDOT 3469087, MC 1134917, GVW 80,000.

52. The tractor-trailer had a Gross Vehicle Weight Rating of 65,000 pounds and a Gross Combination Weight Rating of 65,000 pounds.

53. Defendant Salimin was traveling westbound in the left lane of Interstate 70.

54. Mr. Kenny was traveling parallel to the cab of the tractor-trailer in the right lane.

55. Defendant Salimin initiated a lane change from the left westbound lane into the right westbound lane.

56. The right westbound lane was occupied by Mr. Kenny's vehicle at the time Salimin initiated the lane change.

57. Defendant Salimin's own statement at the scene was: "I WAS IN THE LEFT LANE THE GUY CAME CLOSE TO MY BLIND SIDE AND HE WAS CLOSE TO ME AND I WAS TRY TO CHANGE LANE AND THEIR WAS 1 OTHER CAR IN THE LEFT LANE GOING SLOW THE GUY CLOSE BY TRY TO SPEED UP THEN THIS HAPPENED."

58. Mr. Kenny's statement at the scene was: "I WAS PARALLEL THE CAB OF THE SEMI TRAILER WHEN HE WENT TO CHANGE LANES AND HIT ME. HE STATED HE COULD NOT SEE ME IN HIS MIRRIOR [sic]."

59. Salimin's own words confirm he knew Kenny's vehicle was alongside the tractor-trailer before he moved into the right lane.

60. Defendant Salimin's tractor-trailer struck the driver's side of Mr. Kenny's vehicle.

61. The impact caused Mr. Kenny's vehicle to fishtail back and forth across the roadway before coming under control.

62. Both vehicles came to rest near mile marker 6.00 and were driven from the scene.

63. Mr. Kenny called 911.

64. The Ohio County Sheriff's Department investigated the collision and documented it in Report No. 2025-00068663.

65. Deputy/Corporal Kitzmiller investigated the collision.

66. The crash report reflects that Defendant Salimin's contributing actions included operating the vehicle in an erratic, reckless, or careless manner.

67. Defendant Salimin was cited for improper lane change.

**B. Evaz Prime's Operating History and Regulatory Status**

68. As of December 30, 2025, EVAZ PRIME's USDOT status was listed as ACTIVE by the FMCSA.

69. In the 24 months prior to December 30, 2025, EVAZ PRIME underwent 92 driver inspections and 37 vehicle inspections.

70. Of EVAZ PRIME's vehicle inspections, 11 of 37 resulted in vehicles being placed out of service — a 29.7% out-of-service rate, compared to the national average of 22.26%.

71. EVAZ PRIME had been involved in three reportable crashes in the 24 months prior to December 30, 2025, including one injury crash.

72. EVAZ PRIME's common carrier operating authority was served with an involuntary revocation notice effective February 28, 2025. FMCSA policy expressly provides that involuntary revocation of operating authority reflects "a pattern or practice of avoiding compliance, or masking or otherwise concealing noncompliance, with regulations on commercial motor vehicle safety" and that "[i]nadvertent, isolated, or sporadic violations of applicable requirements generally will not result in revocation, suspension or amendment." A motor carrier that has had its operating authority involuntarily revoked is therefore unsafe.

73. The full scope and effect of EVAZ PRIME's operating authority status on the date of the collision will be developed through discovery.

**C. The Regulatory Framework Governing This Commercial Motor Vehicle Operation**

74. Federal regulations — the Federal Motor Carrier Safety Regulations ("FMCSRs"), 49 C.F.R. Parts 350–399 — establish comprehensive minimum safety standards for motor carriers and drivers operating commercial motor vehicles in interstate commerce.

75. EVAZ PRIME operated as an authorized for-hire, interstate motor carrier transporting general freight and motor vehicles.

76. At all relevant times, EVAZ PRIME and Salimin were subject to and bound by the FMCSRs, including driver qualification requirements in 49 C.F.R. Part 391, driving and

operational safety requirements in 49 C.F.R. Part 392, hours of service requirements in 49 C.F.R. Part 395, vehicle maintenance requirements in 49 C.F.R. Part 396, and safety management requirements in 49 C.F.R. § 390.3.

77. A motor carrier's duties under the FMCSRs are non-delegable.

78. Pursuant to 49 U.S.C. § 31139 and 49 C.F.R. § 390.5, EVAZ PRIME is deemed the statutory employer of Salimin for purposes of the FMCSRs, regardless of how the parties characterized their employment relationship.

**D. Mr. Kenny's Injuries**

79. At the scene of the collision, Mr. Kenny reported left shoulder pain but declined EMS transport.

80. His grandson drove him to the Emergency Department at Trinity Medical Center on the night of December 20, 2025.

81. Emergency physicians diagnosed Mr. Kenny with whiplash (cervical strain) and shoulder sprain arising from the motor vehicle accident.

82. He was prescribed Cyclobenzaprine HCl 10 mg twice daily for ten days and discharged with self-care instructions.

83. Mr. Kenny had no significant medical history and no significant complaints prior to the December 20, 2025 collision.

84. In the days following the collision, Mr. Kenny developed worsening symptoms that were not present before the crash, including brain fog, short-term memory deficits, repeated questioning, cognitive confusion, night sweats, sleep disturbances, and agitation.

85. Mr. Kenny developed severe anxiety about driving on Interstate 70 near the site of the collision, which required him to take an alternative commuting route that increased his travel time and reduced his earnings.

86. On March 9, 2026, Neuropsych Centers evaluated Mr. Kenny and documented the mechanism of injury as a semi-truck switching lanes and striking him on the driver's side door.

87. The treating neurologist, Dr. Ekokobe Fonkem, DO, diagnosed Mr. Kenny with post-concussional syndrome (ICD-10 F07.81), PTSD (ICD-10 F43.10), and depression, unspecified (ICD-10 F32.A).

88. Dr. Fonkem certified: "Within a high degree of medical certainty, the above symptoms were directly related to the corresponding accident."

89. In April 2026, Traumatic Brain Injury Diagnostic Centers USA conducted neurological testing and identified traumatic brain injury, post-concussive symptoms, PTSD-like symptoms, and cervical vestibular mediated injury.

90. Testing showed Mr. Kenny's immediate memory score was below average, his delayed recall was below average, and his overall cognitive total score was below average.

91. Mr. Kenny's balance and fall risk assessment placed him in the high fall-risk category.

92. The interpreting neurologist, Dr. Latai E. Grant Brown, MD, found cognitive deficits, reported symptoms consistent with traumatic brain injury and whiplash injury, and recommended further neurological examination and treatment.

93. Mr. Kenny's impairments substantially limit major life activities, including driving, working at full capacity, sleeping, concentrating, and engaging in social and recreational activities.

94. Despite these limitations, Mr. Kenny has continued to work because he is the sole financial provider for his household and "couldn't support my family otherwise."

95. Before the collision, Mr. Kenny played frisbee golf with his wife five to six rounds of eighteen holes per week. He can no longer do so.

**E. Property Damage, Loss of Transportation, and Sedgwick's Handling of the Claim**

96. The collision caused functional damage to Mr. Kenny's 1989 Buick Electra, his family's only vehicle, rendering it inoperable.

97. Mr. Kenny was required to rent a replacement vehicle in the days following the collision.

98. He was ultimately compelled to purchase a replacement vehicle out of pocket.

99. The loss of his vehicle and the prolonged failure to resolve his property damage claim deprived Mr. Kenny of reliable transportation at the very time he needed it most — while he was injured and actively seeking medical care. Dr. Gerald Booth's chiropractic office, Booth Chiropractic, is located at 56104 National Road, Suite 112A, Bridgeport, Ohio 43912, and Mr. Kenny was without sufficient funds to travel to his appointments. Because he lacked a functioning replacement vehicle, Mr. Kenny was required to walk to medical appointments with Dr. Booth. His lack of reliable transportation has directly interfered with his ability to receive the reasonable and necessary medical care and treatment required by his injuries — injuries caused by the same Defendants whose insurer refused to promptly resolve his property damage claim.

100. The wrecked Buick Electra sat in Mr. Kenny's driveway unrepaired and uncompensated from December 20, 2025, forward.

101. Sedgwick was assigned Claim No. 4A2601LJXDL-0001 and assigned Edward Lee as the initial Claims Representative.

102. Sedgwick's first documented contact with Plaintiff's counsel occurred on or about January 21, 2026, more than a month after the collision.

103. On February 19, 2026, Sedgwick sent Mr. Kenny a medical authorization form seeking all medical records and bills arising from the collision, placing Sedgwick on constructive notice from that date that Mr. Kenny was receiving treatment for physical and mental injuries.

104. On March 27, 2026 — more than three months after the collision — Plaintiff's counsel transmitted a formal property damage demand to Edward Lee identifying Mr. Kenny's damages: total loss of vehicle, rental expenses, out-of-pocket replacement vehicle costs, loss of use, annoyance, and inconvenience.

105. The demand cited *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 421, 475 S.E.2d 507, 513 (1996), which holds that annoyance and inconvenience damages are legally recoverable elements of a West Virginia property damage claim in addition to the vehicle's fair market value.

106. The March 27 demand made clear that the wrecked vehicle had been sitting in Mr. Kenny's driveway since December 20, 2025, and remained there uncompensated at the time of the demand.

107. Sedgwick did not complete an inspection of Mr. Kenny's vehicle until April 28, 2026 — approximately 130 days after the collision.

108. During that entire 130-day period, Sedgwick paid nothing on Mr. Kenny's property damage claim.

109. On May 1, 2026, Sedgwick issued a total loss valuation offer and assigned a new adjuster, Gabrielle Croce.

110. On May 14, 2026, Plaintiff's counsel advised Sedgwick that Mr. Kenny would accept the total loss valuation on one condition: that acceptance not constitute a full and final resolution of his separate claims for rental expenses, out-of-pocket replacement vehicle costs, loss of use, annoyance, and inconvenience.

111. On May 15, 2026, adjuster Croce refused that condition and dismissed Mr. Kenny's annoyance and inconvenience claim by stating it was "not measurable as feelings cannot be measured for compensation."

112. That statement is a direct misstatement of the controlling West Virginia authority Plaintiff's counsel had already cited in writing to Sedgwick weeks earlier.

113. Sedgwick's position was that Mr. Kenny's only options were to accept the total loss valuation as a complete release of all property damage claims or to receive nothing.

114. On May 19, 2026, Plaintiff's counsel advised Sedgwick that the claim was continuing to accrue additional damages with each passing day of delay.

115. On June 1, 2026, Claims Manager Lauren Burke confirmed Sedgwick's final position: it would offer only the total loss valuation and reimbursement for a limited rental period, and nothing for loss of use, annoyance, or inconvenience.

116. On June 1, 2026, Plaintiff's counsel wrote to Sedgwick's Claims Team Lead Sedrick Hicks expressly disclosing that Mr. Kenny is an individual over the age of forty, a veteran of the United States Air Force receiving care through the U.S. Department of Veterans Affairs, and a person suffering from physical and mental impairments arising from the collision that substantially limit major life activities.

117. That June 1 letter specifically invoked the West Virginia Human Rights Act and *Michael v. Appalachian Heating, LLC*, 226 W. Va. 394, 701 S.E.2d 116 (2010).

118. Within hours of receiving that letter, Claims Manager Lauren Burke denied all additional demands in full on the same day — June 1, 2026.

119. Sedgwick had constructive knowledge of Mr. Kenny's age from the inception of the claim; his date of birth, January 19, 1961, appears in the claim file, placing him at sixty-four years of age at the time of the collision.

120. The U.S. Department of Veterans Affairs transmitted a federal subrogation notice to Sedgwick asserting its right to recover costs for treating Mr. Kenny's collision-related injuries, providing Sedgwick with additional constructive notice that Mr. Kenny is a veteran receiving ongoing VA care.

121. Sedgwick retained CCC Intelligent Solutions Inc. ("CCC"), a third-party automated valuation vendor, to generate the total-loss valuation for Mr. Kenny's vehicle. CCC's system — CCC ONE® — produced a Market Valuation Summary, Report Reference No. 130922204, dated April 30, 2026, prepared for Sedgwick and listing Barry Porter as adjuster and Carl Hirt as appraiser.

122. The CCC ONE® system derives the "Base Vehicle Value" through a database search for comparable vehicles, applying algorithmic adjustments for mileage, equipment, and condition based on data inputs provided to CCC by Sedgwick. By CCC's own description, the final value is a "weighted average of the adjusted values of the comparable vehicles" based on source, similarity, proximity, and recency — a fully automated, standardized calculation.

123. The CCC ONE® report applied a "Condition Adjustment" of negative $175.00 to Mr. Kenny's vehicle based on a notation that the front seats were ripped and the headliner needed replacement. This downward adjustment was not individualized to Mr. Kenny's circumstances, was not explained to him, and was based on interior wear observations that do not reflect the vehicle's overall mechanical condition, which was rated only "Moderate Wear" with the notation "oil clean."

124. The two comparable vehicles CCC selected were located 250 miles away in Richmond, Virginia, and 320 miles away in Grand Rapids, Michigan — neither of which is local to Mr. Kenny's garage location in Bridgeport, Ohio. CCC's own methodology acknowledges that the garage zip code "determines the starting point for the search" for local comparable vehicles. The use of comparables from outside the local market is a known feature of automated systems that apply standardized, non-individualized adjustments rather than a genuine assessment of local market value.

125. The CCC ONE® valuation does not adopt the advertised prices of the comparable vehicles as listed. Instead, CCC derived an "Adjusted Comparable Value" for each comparable — $3,622 for the first and $2,254 for the second — by applying its own proprietary adjustments to the listings and then computing a weighted average of the adjusted figures according to criteria CCC describes as accounting for similarity, location, recency, and whether CCC inspected the comparable. The report does not transparently disclose how each comparable's advertised or list price was reduced to its adjusted value, or the basis and magnitude of the weighting CCC applied among the comparables. To the extent the reduction from the comparables' advertised prices to their adjusted values reflects standardized, algorithmic downward corrections beyond the disclosed mileage, equipment, and condition line items, such corrections were applied uniformly by software — without reference to the particular vehicle, the particular owner, or the actual local market conditions applicable to Mr. Kenny's claim — and were neither disclosed to nor explained to him.

126. Sedgwick adopted the CCC ONE® valuation as the basis for its total-loss offer to Mr. Kenny without conducting an independent review of the algorithmic adjustments applied, without verifying whether the selected comparable vehicles were representative of the actual local market

for Mr. Kenny's vehicle in Bridgeport, Ohio, and without adjusting the output to reflect the specific circumstances of Mr. Kenny's claim.

127. Sedgwick publicly acknowledges that its automated tools require meaningful human oversight — that "human oversight remains central" to its process, that a "human-in-the-loop" model is necessary to ensure the reliability of AI-generated outputs, and that automated outputs left unchecked may reflect cost-containment objectives and may disadvantage claimants who do not fit standardized profiles. Sedgwick did not exercise that human oversight here: it accepted the CCC ONE® output as produced, without independent appraisal, without challenging the comparables, without adjusting for the non-local sourcing of those comparables, and without accounting for Mr. Kenny's particular circumstances as a person of limited means for whom this vehicle was his family's only transportation.

128. The specific inputs Sedgwick provided to CCC, the parameters CCC used to select comparables, the nature and magnitude of any algorithmic adjustments applied to the comparables beyond the disclosed line items, and the degree of human review Sedgwick performed on the CCC ONE® output before presenting it to Mr. Kenny are facts within Sedgwick's and CCC's knowledge and will be developed through discovery.

## APPLICABLE STANDARDS OF CARE — DEFENDANT SALIMIN

At all relevant times, the following duties governed Defendant Salimin's operation of the commercial motor vehicle:

129. **A commercial motor vehicle driver must maintain a proper lookout for all vehicles sharing the road.** This duty is grounded in 49 C.F.R. § 392.2, which requires CMV drivers to comply with all applicable traffic laws, and in the fundamental principle that a driver must see what is there to be seen.

130. **A commercial motor vehicle driver must not initiate a lane change unless the target lane is clear of other vehicles.** This duty is grounded in West Virginia traffic laws governing lane usage and in 49 C.F.R. § 392.2.

131. **A commercial motor vehicle driver must use systematic mirror checks and blind-spot verification to locate all vehicles around the CMV before moving the vehicle laterally.** CDL training standards require drivers to perform a full visual check of the target lane and adjacent space before initiating any lane change. This duty is codified in federal law: 49 C.F.R. § 383.111 mandates that "All CMV operators must have knowledge" of twenty general areas, including specifically "Visual Search" and "Space Management." All drivers of CMVs must have the knowledge and skills necessary to operate a CMV safely as contained in that subpart. Failure to perform adequate visual scanning before a lane change constitutes a violation of the specific knowledge requirements federal law imposes on every CDL holder.

132. **A commercial motor vehicle driver must exercise the degree of care demanded by the size and weight of the vehicle being operated.** A driver who knows he is operating an 80,000-pound machine that can crush a passenger car bears a correspondingly greater duty of care.

133. **A commercial motor vehicle driver must not operate the vehicle in an erratic, reckless, or careless manner.** This duty is grounded in 49 C.F.R. § 392.2 and West Virginia's traffic statutes.

**APPLICABLE STANDARDS OF CARE — DEFENDANT EVAZ PRIME**

At all relevant times, the following duties governed Defendant EVAZ PRIME's operation as a motor carrier:

134. **A motor carrier must not allow a driver to operate a commercial motor vehicle unless that driver is fully qualified under 49 C.F.R. Part 391**, including possessing a

satisfactory driving record and meeting all medical and licensing requirements. A motor carrier's qualification duty further requires the pre-employment background investigation mandated by 49 C.F.R. § 391.23, including inquiry to each state where the driver has held a license during the preceding three years and investigation into safety violations at all previous employers where the driver operated a commercial motor vehicle. A motor carrier must consider as much information about the driver's experience as is reasonably available, and without completing this investigation, a motor carrier cannot know whether the driver it is placing behind the wheel is safe to operate the commercial motor vehicle. Critically, a CDL does not indicate that the holder is a trained or experienced truck or bus driver; it merely indicates that the holder has passed minimal skills and knowledge tests concerning the type of vehicle he or she proposes to drive. It is incumbent upon the prospective employer of a commercial vehicle driver to ensure that driver is properly trained to operate that employer's trucks or buses and to handle that employer's freight or passengers. Possession of a CDL, standing alone, does not satisfy the motor carrier's qualification and investigation obligations.

135. **A motor carrier must provide its drivers with adequate training on safe lane-change procedures, proper visual scanning, and space management before permitting them to operate commercial motor vehicles**, as required by 49 C.F.R. § 383.111. The U.S. Department of Transportation has specifically warned motor carriers: "A CDL does not indicate that the holder is a trained or experienced truck or bus driver" and that possession of a CDL is not sufficient because "[i]t is incumbent upon the prospective employer of a commercial vehicle driver to ensure that driver is properly trained to operate that employer's trucks or buses." Moreover, the FMCSA has identified training as a critical component of the Safety Management Cycle — the framework through which motor carriers are expected to address safety

deficiencies. Because a CDL demonstrates only that a driver passed a minimum knowledge test, a motor carrier that allows a driver to operate a CMV without ensuring that driver has received adequate training on the specific maneuvers demanded by interstate highway driving has failed this duty.

136. **A motor carrier must monitor its drivers' compliance with safety regulations and traffic laws on an ongoing basis**, as required by 49 C.F.R. § 390.3(e).

137. **A motor carrier must not entrust a commercial motor vehicle to a driver it knows, or should know, to be incompetent or unqualified to operate it safely.**

138. **A motor carrier must maintain all commercial motor vehicles under its control in safe operating condition through systematic inspection, repair, and maintenance**, as required by 49 C.F.R. Part 396. The obligation is underscored by 49 C.F.R. § 396.7, which independently prohibits the operation of any motor vehicle "in such a condition as to likely cause an accident or a breakdown of the vehicle." The Commercial Vehicle Safety Alliance defines out-of-service violations as those involving safety defects so dangerous they are "likely to cause a crash" — making a pattern of out-of-service violations direct evidence of systemic failures to meet this obligation.

139. **A motor carrier must establish, implement, and enforce a safety management and compliance program adequate to prevent the violations described herein**, as required by 49 C.F.R. § 390.3. The FMCSA's Safety Management Cycle requires motor carriers to address safety through interlocking components: policies and procedures, roles and responsibilities, qualification and hiring, training and communication, monitoring and tracking, and meaningful action on deficiencies. A motor carrier that lacks any component of this cycle fails its non-delegable obligation to the traveling public.

## APPLICABLE STANDARDS OF CARE — DEFENDANT SEDGWICK

At all relevant times, the following duties governed Defendant Sedgwick's handling of Mr. Kenny's property damage claim:

140. **A claims adjuster must apply controlling state law to all legally recognized categories of a claimant's damages**, including loss of use, annoyance, and inconvenience. Under *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 421, 475 S.E.2d 507, 513 (1996), these are legally established elements of a West Virginia property damage claim.

141. **A claims adjuster must not condition payment of undisputed compensation on the claimant's waiver of separately cognizable, disputed claims.**

142. **A claims adjuster must not treat claimants differently on the basis of disability, age, or other characteristics protected under the West Virginia Human Rights Act**, W. Va. Code § 5-11-1 et seq.

143. **A claims adjuster must conduct a meaningful, individualized evaluation of each claimant's particular circumstances** rather than applying a categorical denial policy or delegating that evaluation entirely to an automated third-party system without independent human review.

## VIOLATIONS OF THE APPLICABLE STANDARDS

**Defendant Salimin's Violations:**

144. Defendant Salimin failed to keep a proper lookout for Mr. Kenny's vehicle, which was traveling alongside the tractor-trailer in the right lane in plain sight, in violation of the duty set forth in paragraph 129.

145. Defendant Salimin initiated a lane change into the right westbound lane when Mr. Kenny's vehicle was already occupying that lane, in violation of the duty set forth in paragraph 130.

146. Defendant Salimin failed to use systematic mirror checks and blind-spot verification before initiating the lane change — confirmed by his own statement that Mr. Kenny "CAME CLOSE TO MY BLIND SIDE" before Salimin moved into the right lane — in violation of the duty set forth in paragraph 131. This failure is not merely a general lapse of care; it is a violation of the specific Visual Search and Space Management knowledge requirements that federal law — 49 C.F.R. § 383.111 — mandates for every CDL driver.

147. Defendant Salimin moved an 80,000-pound commercial motor vehicle into an occupied lane on an interstate highway without taking the precautions that the size and danger of the vehicle demanded, in violation of the duty set forth in paragraph 132.

148. The crash report reflects that Defendant Salimin's contributing actions included operating the vehicle in an erratic, reckless, or careless manner, and he was cited for improper lane change, in violation of the duty set forth in paragraph 133.

**Defendant EVAZ PRIME's Violations:**

149. Defendant EVAZ PRIME placed Salimin behind the wheel without adequately verifying that he was qualified, had a satisfactory driving history, and was competent to operate the commercial motor vehicle safely, in violation of the duty set forth in paragraph 134 and 49 C.F.R. Part 391. Specifically, EVAZ PRIME failed to conduct the investigation required by 49 C.F.R. § 391.23 — including inquiry to each state where Salimin held a license and investigation of safety violations at all previous employers where he operated a commercial motor vehicle — without which EVAZ PRIME could not have known whether Salimin was safe to operate the commercial motor vehicle on a public interstate highway. EVAZ PRIME cannot satisfy its qualification obligations by pointing to Salimin's CDL: a CDL merely indicates that the holder has passed

minimal skills and knowledge tests and does not indicate that the holder is a trained or experienced truck or bus driver.

150. Defendant EVAZ PRIME failed to provide Salimin with adequate training on safe lane-change procedures, systematic visual scanning, and space management, in violation of the duty set forth in paragraph 135 and 49 C.F.R. § 383.111. Because a CDL demonstrates only that a driver passed a minimum knowledge test and not that the driver is trained or experienced, it is incumbent upon the employer to ensure that the driver is properly trained to operate that employer's trucks or buses. EVAZ PRIME bore the full, non-delegable obligation to train Salimin on the precise skills, Visual Search, Space Management, and safe lateral movement, that he failed to employ on December 20, 2025.

151. Defendant EVAZ PRIME failed to monitor and supervise Salimin's compliance with safety regulations and traffic laws on an ongoing basis, in violation of the duty set forth in paragraph 136 and 49 C.F.R. § 390.3(e).

152. Defendant EVAZ PRIME entrusted the commercial motor vehicle to Salimin when it knew or should have known that he was incompetent or unqualified to operate it safely, in violation of the duty set forth in paragraph 137.

153. Defendant EVAZ PRIME's vehicle out-of-service rate of 29.7%, substantially above the national average of 22.26%, is evidence of systemic failure to maintain commercial motor vehicles in safe operating condition, in violation of the duty set forth in paragraph 138 and 49 C.F.R. Part 396. Out-of-service violations are defined by the FMCSA and the Commercial Vehicle Safety Alliance as violations so dangerous they are "likely to cause a crash," and 49 C.F.R. § 396.7 independently prohibits the operation of any motor vehicle "in such a condition as to likely cause

an accident or a breakdown of the vehicle." A trucking company with a vehicle out-of-service rate materially above the national average is unsafe.

154. Defendant EVAZ PRIME failed to establish and enforce a safety management and compliance program adequate to prevent the violations described herein, in violation of the duty set forth in paragraph 139 and 49 C.F.R. § 390.3. The FMCSA's Safety Management Cycle, encompassing policies and procedures, roles and responsibilities, qualification and hiring, training and communication, monitoring and tracking, and meaningful action, exists precisely to prevent the failures reflected in this case. EVAZ PRIME's record of above-average vehicle out-of-service rates, reportable crashes, and its driver's admission of failure to perform a basic visual check before changing lanes on an interstate highway demonstrate that no component of this cycle was operating adequately.

**Defendant Sedgwick's Violations:**

Defendant Sedgwick failed to apply controlling West Virginia law to Mr. Kenny's claim, in violation of the duty set forth in paragraph 140: adjuster Croce categorically dismissed his annoyance and inconvenience damages as "not measurable as feelings cannot be measured for compensation" — a position that directly contradicts *McCormick v. Allstate*, *supra*, which Plaintiff's counsel had cited to Sedgwick in writing before Sedgwick issued that denial. See also *Checker Leasing, Inc. v. Sorbello*, 181 W.Va. 199, 382 S.E.2d 36 (1989) ; and *Ellis v. King*, 184 W. Va. 227, 229, 400 S.E.2d 235, 237 (1990)("Damages for annoyance and inconvenience may also be recovered when measuring damages for loss of use to the property"). Defendant Sedgwick conditioned payment of the undisputed total loss valuation on Mr. Kenny's execution of a complete release of all property damage claims, including his separate, accruing

claims for loss of use, annoyance, and inconvenience, in violation of the duty set forth in paragraph 141 — a condition with no basis in West Virginia law.

155. With actual and constructive knowledge of Mr. Kenny's disability and age, Defendant Sedgwick denied all of his claims in full on the same day — June 1, 2026 — that it received formal written notice of his protected characteristics under the West Virginia Human Rights Act, without any individualized reconsideration, in violation of the duty set forth in paragraph 142.

156. Rather than examining the specific facts of Mr. Kenny's claim — a 64-year-old person with physical and mental disabilities, without his family's only vehicle for 130 days, required to walk to chiropractic appointments, unable to get to medical providers, the sole financial provider for his household — Sedgwick delegated the valuation of his vehicle to a third-party automated system, accepted that system's output without independent human review, and applied a categorical, standardized refusal to recognize legally established damage categories, in violation of the duty set forth in paragraph 143.

**CAUSATION**

159. Each of Defendant Salimin's violations of the applicable duties directly caused or contributed to cause the December 20, 2025 collision.

160. Had Defendant Salimin kept a proper lookout, confirmed the right lane was clear, and used proper visual scanning, he would have seen Mr. Kenny's vehicle and would not have initiated the lane change.

161. Had Defendant EVAZ PRIME properly qualified, trained, and supervised Salimin, Salimin would have possessed the skills and instruction needed to execute lane changes safely on an interstate highway.

162. The collision was the direct and proximate cause of all injuries Mr. Kenny sustained.

163. Mr. Kenny had no significant medical history and no significant pre-injury complaints before the collision.

164. The mechanism of the collision — a lateral impact to the driver's side of Mr. Kenny's vehicle from an 80,000-pound tractor-trailer — is consistent with and sufficient to cause the injuries he sustained, including cervical strain, shoulder injury, traumatic brain injury, post-concussional syndrome, and the neurological and psychological sequelae documented by his treating providers. The medical and scientific literature establishes that post-concussional syndrome, traumatic brain injury, and PTSD are well-recognized sequelae of motor vehicle trauma; that PTSD can occur in the context of minor or severe TBI; and that the comorbidity of PTSD and TBI is well described and creates a synergistic burden on cognitive and psychological functioning — precisely the pattern of injuries documented in Mr. Kenny's case.

165. Dr. Fonkem certified, within a high degree of medical certainty, that Mr. Kenny's diagnosed symptoms were directly related to the December 20, 2025 collision.

166. Dr. Grant Brown identified traumatic brain injury, post-concussive symptoms, PTSD-like symptoms, and cervical vestibular mediated injury consistent with the mechanism of the collision and confirmed by objective neurological testing.

## INJURIES, TREATMENT, AND DAMAGES

### A. Injuries

167. As a direct and proximate result of the collision, Mr. Kenny sustained the following genuine injuries:

168. Cervical strain (whiplash) with pain radiating into the neck and left arm, diagnosed at Trinity Medical Center on December 20, 2025.

169. Left shoulder sprain, diagnosed at Trinity Medical Center on December 20, 2025.

170. Numbness and tingling in the left arm and left hand, reported as immediate post-collision symptoms.

171. Post-concussional syndrome (ICD-10 F07.81), diagnosed by Dr. Fonkem with slowed processing speed as a documented cognitive finding.

172. Traumatic brain injury, confirmed by objective neurological testing at Traumatic Brain Injury Diagnostic Centers USA.

173. Cervical vestibular mediated injury, documented by objective neurological testing.

174. PTSD (ICD-10 F43.10), diagnosed by Dr. Fonkem.

175. Depression, unspecified (ICD-10 F32.A), diagnosed by Dr. Fonkem.

176. Cognitive deficits in immediate memory, delayed recall, and overall cognitive performance, documented by objective testing below age-normed averages.

177. High fall risk, as measured by the Balance and Fall Risk Assessment administered by Traumatic Brain Injury Diagnostic Centers USA.

178. Persistent sleep disturbance, including night sweats and difficulty sleeping, beginning immediately after the collision.

179. Severe anxiety and inability to drive Interstate 70 near the site of the collision, substantially limiting Mr. Kenny's ability to commute normally and earn his full wages.

**B. Treatment**

180. Mr. Kenny sought medical care immediately following the collision, and has received ongoing care through the date of filing.

181. He received emergency department evaluation and treatment at Trinity Medical Center on December 20–21, 2025.

182. He received neuropsychological evaluation and treatment at Neuropsych Centers in March and April 2026.

183. He underwent neurological testing at Traumatic Brain Injury Diagnostic Centers USA in April 2026.

184. He received chiropractic care at Booth Chiropractic, 56104 National Road, Suite 112A, Bridgeport, Ohio 43912, under the care of Dr. Gerald Booth.

185. He was evaluated and treated by 1st Pain Specialists, including receipt of SOAP note evaluations and referrals for imaging.

186. He receives ongoing care through the U.S. Department of Veterans Affairs for collision-related injuries.

187. Every course of treatment Mr. Kenny received was reasonable.

188. Every course of treatment Mr. Kenny received was medically necessary.

189. Every course of treatment Mr. Kenny received was causally related to the December 20, 2025 collision.

190. Defendant must admit each of those facts, or in denying them, assert that Mr. Kenny and his treating providers are not telling the truth.

**C. Damages**

191. As a direct and proximate result of the collision and Defendants' conduct, Mr. Kenny has suffered and will continue to suffer the following categories of damages:

192. Past and future medical expenses for all treatment described herein and for treatment reasonably certain to be required in the future.

193. Past lost wages and future loss of earning capacity, arising from Mr. Kenny's inability to work at full capacity, his requirement to take a longer commuting route, and the limitations imposed by his injuries on his physical and cognitive performance.

194. The total loss of his 1989 Buick Electra — his family's only vehicle.

195. Rental expenses incurred as a result of the vehicle loss.

196. Out-of-pocket cost of purchasing a permanent replacement vehicle.

197. Loss of use of his vehicle for the extended period during which he was deprived of adequate transportation.

198. Damages for annoyance and inconvenience arising from the prolonged deprivation of his only transportation, recoverable under *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 421, 475 S.E.2d 507, 513 (1996).

199. Damages for the interference with Mr. Kenny's ability to receive reasonable and necessary medical care caused by the loss of his vehicle, including the hardship of walking to chiropractic appointments with Dr. Gerald Booth at Booth Chiropractic in Bridgeport, Ohio, while injured and in pain.

200. Past and future physical pain and suffering.

201. Past and future mental and emotional suffering, including PTSD, anxiety, and depression.

202. Loss of enjoyment of life, including inability to engage in recreational activities he previously enjoyed, such as frisbee golf with his wife.

203. Cognitive impairment affecting concentration, memory, and information processing.

204. Permanency of injuries.

205. Sleep disturbance as a long-term or permanent sequela of the collision.

206. Duties under duress — Mr. Kenny has continued to work despite pain and disability because he has no other means to support his household.

207. Loss of household services.

**COUNT I — NEGLIGENCE AND RECKLESSNESS**

*(Against Defendant Ahmed Abdi Salimin)*

208. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

209. At all relevant times, Defendant Salimin owed Plaintiff the safety duties identified in paragraphs 129–133.

210. Each duty is grounded in a source Defendant cannot dispute: 49 C.F.R. § 392.2, West Virginia traffic laws governing lane usage, CDL training standards, and the bedrock principle that a driver of an 80,000-pound vehicle must exercise care commensurate with the danger the vehicle poses. The specific Visual Search and Space Management knowledge requirements of 49 C.F.R. § 383.111 impose additional, independent duties that Salimin was legally obligated to meet.

211. Defendant Salimin breached each of those duties in the specific ways identified in paragraphs 144 through 148.

212. Defendant Salimin's failure to keep a proper lookout, his failure to confirm the right lane was clear, and his failure to use proper visual scanning each constitute violations of applicable West Virginia traffic laws and 49 C.F.R. § 392.2.

213. Those violations are prima facie evidence of Defendant Salimin's negligence. *Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990), Syl. Pt. 1.

214. Mr. Kenny is within the class of motorists lawfully traveling on public highways — the class those statutes and regulations were designed to protect.

215. The harm he suffered — a lane-change collision and resulting physical injuries — is precisely the type of harm those statutes and regulations were designed to prevent. *Shaffer v. Acme Limestone Co.*, 206 W. Va. 333, 524 S.E.2d 688 (1999), Syl. Pt. 7.

216. Defendant Salimin's violations were the proximate cause of the collision and of all injuries and damages Mr. Kenny sustained.

217. Defendant Salimin's conduct was not merely negligent.

218. Salimin acknowledged at the scene that Mr. Kenny's vehicle was alongside the tractor-trailer cab when he initiated the lane change.

219. He moved an 80,000-pound vehicle into an occupied lane despite that knowledge, on an interstate highway at night.

220. That conduct was reckless, willful, and wanton, and demonstrated a conscious disregard for the safety of others.

221. Defendant Salimin's reckless conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests judgment against Defendant Ahmed Abdi Salimin for compensatory damages including past and future medical expenses, past lost wages and future loss of earning capacity, property damage, loss of use, annoyance and inconvenience, interference with medical care, past and future physical pain and mental suffering, emotional distress, loss of enjoyment of life, cognitive impairment, permanency of injuries, sleep disturbance, duties under duress, and loss of household services; for punitive damages; for costs and expenses; for pre-judgment and post-judgment interest; for a trial by jury on all issues; and for all other just and proper relief.

**COUNT II — VICARIOUS LIABILITY**

*(Against Defendant Evaz Prime Inc. and Other Defendants)*

222. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

223. At all times relevant herein, Defendant Salimin was an employee, agent, and/or statutory employee of Defendant EVAZ PRIME.

224. He was operating a commercial motor vehicle bearing EVAZ PRIME's DOT number and MC number, under EVAZ PRIME's operating authority, for EVAZ PRIME's business purposes.

225. He was acting within the course and scope of his relationship with EVAZ PRIME at the time of the collision.

226. Under the doctrine of respondeat superior, EVAZ PRIME is vicariously liable for all of Salimin's negligent, reckless, willful, and wanton conduct as set forth in Count I.

227. Pursuant to 49 U.S.C. § 31139 and 49 C.F.R. § 390.5, EVAZ PRIME is the statutory employer of Salimin for purposes of the FMCSRs, regardless of the parties' characterization of their employment relationship.

228. As Salimin's statutory employer, EVAZ PRIME is vicariously liable for all FMCSR violations committed by Salimin in the operation of the commercial motor vehicle.

229. At all relevant times, Defendants EVAZ PRIME and JOHN DOE DEFENDANT(S) were engaged in a joint venture or joint enterprise for the purpose of transporting goods in interstate commerce for profit.

230. They shared a common business purpose and the right to direct and control the conduct of Defendant Salimin.

231. By virtue of their participation in a joint venture or joint enterprise, they are jointly and severally liable for Salimin's negligent, reckless, willful, and wanton conduct.

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests judgment against Defendants EVAZ PRIME INC. and JOHN DOE DEFENDANT(S), jointly and severally, for compensatory damages including past and future medical expenses, past lost wages and future loss of earning capacity, property damage, loss of use, annoyance and inconvenience, interference with medical care, past and future physical pain and mental suffering, emotional distress, loss of enjoyment of life, cognitive impairment, permanency of injuries, sleep disturbance, duties under duress, and loss of household services; for punitive damages; for costs and expenses; for pre-judgment and post-judgment interest; for a trial by jury on all issues; and for all other just and proper relief.

**COUNT III — DIRECT NEGLIGENCE AND RECKLESSNESS**

*(Against Defendant Evaz Prime Inc. and Corporate Defendants)*

232. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

233. At all relevant times, Defendant EVAZ PRIME owed Plaintiff and the traveling public the independent duties identified in paragraphs 134–139.

234. In obtaining and maintaining operating authority under USDOT Number 3469087, EVAZ PRIME certified to the FMCSA that it would comply with all applicable FMCSRs, including the duty to qualify and supervise drivers, maintain vehicles, and implement a safety management program.

235. Defendant EVAZ PRIME breached each of those duties in the specific ways identified in paragraphs 149 through 154.

236. EVAZ PRIME's failures — to qualify, train, supervise, and retain Salimin safely, to maintain its vehicles, and to implement an adequate safety management program — constitute violations of 49 C.F.R. Parts 391, 383, 390, and 396.

237. Those violations are prima facie evidence of EVAZ PRIME's negligence. *Anderson v. Moulder*, 183 W. Va. 77, 394 S.E.2d 61 (1990), Syl. Pt. 1.

238. Mr. Kenny is within the class of persons those regulations were designed to protect.

239. The harm he suffered is precisely the type of harm those regulations were designed to prevent. *Shaffer v. Acme Limestone Co.*, 206 W. Va. 333, 524 S.E.2d 688 (1999), Syl. Pt. 7.

240. EVAZ PRIME's direct negligence is independent of and in addition to its vicarious liability for Salimin's conduct.

241. EVAZ PRIME's failures were a direct and proximate cause of the December 20, 2025 collision.

242. EVAZ PRIME's failures were a direct and proximate cause of all injuries and damages sustained by Mr. Kenny.

243. EVAZ PRIME's conduct was willful, wanton, and reckless, demonstrating a conscious disregard for the safety of the traveling public.

244. That conduct warrants an award of punitive damages.

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests judgment against Defendants EVAZ PRIME INC. and JOHN DOE DEFENDANT(S), jointly and severally, for compensatory damages including past and future medical expenses, past lost wages and future loss of earning capacity, property damage, loss of use, annoyance and inconvenience, interference with medical care, past and future physical pain and mental suffering, emotional distress, loss of enjoyment of life, cognitive impairment, permanency of injuries, sleep disturbance, duties under duress, and loss of household services; for punitive damages; for costs and expenses; for pre-judgment and post-judgment interest; for a trial by jury on all issues; and for all other just and proper relief.

## COUNT IV — PROPERTY DAMAGE

*(Against Defendants Evaz Prime Inc. and Ahmed Abdi Salimin)*

245. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

246. As a direct and proximate result of Defendants' conduct, Mr. Kenny's 1989 Buick Electra, VIN 1G4CW54C9K1636907, was rendered a total loss.

247. That vehicle was his family's only means of transportation.

248. Mr. Kenny is entitled to recover the fair market value of the vehicle.

249. Mr. Kenny is entitled to recover his rental expenses incurred as a result of the loss.

250. Mr. Kenny is entitled to recover his out-of-pocket cost of purchasing a permanent replacement vehicle.

251. Mr. Kenny is entitled to recover damages for loss of use for the full period during which he was deprived of adequate transportation.

252. Under *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 421, 475 S.E.2d 507, 513 (1996), Mr. Kenny is additionally entitled to damages for annoyance and inconvenience arising from that deprivation.

253. Those damages are separate from and in addition to the vehicle's fair market value.

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests judgment against Defendants EVAZ PRIME INC. and Ahmed Abdi Salimin for the fair market value of the total loss of his vehicle, rental expenses, out-of-pocket replacement vehicle costs, loss of use, annoyance and inconvenience, pre-judgment and post-judgment interest, costs, and all other just and proper relief.

## COUNT V — VIOLATIONS OF THE WEST VIRGINIA HUMAN RIGHTS ACT

*(Against Defendant Sedgwick Claims Management Services, Inc.)*

254. Plaintiff incorporates by reference all preceding paragraphs as if fully restated herein.

### A. Plaintiff's Protected Characteristics

255. Plaintiff Paul B. Kenny is a person with a disability within the meaning of W. Va. Code § 5-11-3(m).

256. He has been diagnosed with post-concussional syndrome (ICD-10 F07.81), PTSD (ICD-10 F43.10), and depression (ICD-10 F32.A), all arising from the December 20, 2025 collision and documented in clinical evaluations at Neuropsych Centers in March and April 2026.

257. Objective neurological testing at Traumatic Brain Injury Diagnostic Centers USA in April 2026 confirmed traumatic brain injury, post-concussive symptoms, PTSD-like symptoms, and cervical vestibular mediated injury.

258. These impairments substantially limit the major life activities of driving, working at full capacity, sleeping, concentrating, processing information, and engaging in social and recreational activities.

259. Mr. Kenny therefore has a disability as defined in W. Va. Code § 5-11-3(m): a physical or mental impairment that substantially limits one or more major life activities, and a record of such impairment documented in clinical records.

260. Mr. Kenny is a veteran of the United States Air Force, honorably discharged in 1986, and receives care through the U.S. Department of Veterans Affairs.

261. His veteran status is noted as descriptive context only; the operative protected characteristic under the West Virginia Human Rights Act is his disability as defined in W. Va. Code § 5-11-3(m) and described above.

262. Mr. Kenny was sixty-four years old at the time of the collision, born January 19, 1961, placing him within the class of individuals protected on the basis of age under the West Virginia Human Rights Act.

**B. Sedgwick's Obligations Under the West Virginia Human Rights Act**

263. Sedgwick is a "place of public accommodations" and/or a party engaged in commerce subject to W. Va. Code § 5-11-9(7)(A).

264. W. Va. Code § 5-11-9(7)(A) prohibits unlawful discrimination by a tortfeasor's insurer and its agents in the settlement of a property damage claim.

265. As recognized in *Michael v. Appalachian Heating, LLC*, 226 W. Va. 394, 701 S.E.2d 116 (2010), this prohibition applies to claims administrators such as Sedgwick and is not precluded by W. Va. Code § 33-11-4a(a).

**C. Sedgwick's Knowledge of Plaintiff's Protected Characteristics**

266. Sedgwick had constructive knowledge of Mr. Kenny's age from the inception of the claim; his date of birth — January 19, 1961 — is in the claim file.

267. By February 19, 2026, Sedgwick had sought all of Mr. Kenny's medical records arising from the collision, placing it on constructive notice that he was receiving treatment for physical and mental injuries.

268. The VA's federal subrogation notice placed Sedgwick on constructive notice that Mr. Kenny is a veteran receiving ongoing VA care for collision-related conditions.

269. On June 1, 2026, Sedgwick received explicit written notice from Plaintiff's counsel that Mr. Kenny is a person with disabilities and an individual over the age of forty, with a specific invocation of the West Virginia Human Rights Act.

270. Within hours of that notice, Sedgwick denied all additional demands in full on the same day, without any individualized reconsideration.

**D. Primary Theory: Disparate Treatment and Coercive Claim Handling**

271. Sedgwick's primary violation is direct disparate treatment: its human adjusters and managers, with actual and constructive knowledge of Mr. Kenny's disability and age, refused to apply established West Virginia law to his claim, refused to preserve his separate cognizable claims while paying undisputed amounts, and exploited his disability-driven economic vulnerability to coerce him into waiving rights he was plainly entitled to exercise.

272. Adjuster Croce stated categorically on May 15, 2026, that annoyance and inconvenience damages were "not measurable as feelings cannot be measured for compensation." This was not an individualized evaluation of Mr. Kenny's circumstances. It was a standardized, across-the-board refusal applied without regard to the specific facts of his claim, the length of his deprivation, or the particular hardship he experienced as a person with physical and mental disabilities who needed his vehicle to travel to medical appointments — including chiropractic appointments he was forced to walk to — and to earn his living.

273. Sedgwick then conditioned payment of the undisputed total loss valuation on Mr. Kenny's execution of a complete release of all property damage claims, including his legally cognizable claims for loss of use, annoyance, and inconvenience. This coercive condition had no basis in West Virginia law.

274. Sedgwick received formal notice of Mr. Kenny's disability and age on June 1, 2026, and denied all demands the same day without any individualized reassessment of his claim or his circumstances.

275. The circumstances of Mr. Kenny's claim demanded individualized attention: a sixty-four-year-old person with documented physical and mental disabilities limiting his ability to drive, work, and sleep; without his family's only vehicle for 130 days; forced to walk to chiropractic appointments while injured; unable to get to medical providers; the sole financial provider for his household; without the financial means to self-finance substitute transportation or await resolution of a protracted claim. Sedgwick applied none of that individualized attention. It applied a form policy.

276. Sedgwick's withholding of property damage compensation — conditioned on a complete release — was designed to exploit Mr. Kenny's economic vulnerability. That vulnerability was caused and prolonged by his disability and its functional and financial consequences. The deliberate use of a claimant's disability-driven economic dependency as a claim-resolution tool constitutes discrimination on the basis of disability within the meaning of W. Va. Code § 5-11-9(7)(A).

**E. Delegation to Automated Third-Party Valuation Without Adequate Independent Human Review**

277. Plaintiff alleges that Sedgwick's delegation of the total-loss valuation to a third-party automated system — and its failure to exercise the independent human oversight it publicly represents as essential — contributed to and exacerbated the discriminatory outcome described above.

278. Sedgwick retained CCC Intelligent Solutions Inc. to value Mr. Kenny's vehicle using the CCC ONE® automated platform, which applies standardized, non-individualized adjustments — including a condition adjustment of negative $175.00 — and which selects comparable vehicles and computes a weighted average of their adjusted values according to proprietary criteria not

disclosed to or subject to review by the claimant. The derivation of the adjusted comparable values from the comparables' advertised prices is not transparently disclosed in the report.

279. Sedgwick had a duty to ensure that the automated valuation system it used did not produce discriminatory outcomes and did not substitute algorithmic cost-containment for the individualized assessment to which Mr. Kenny was entitled as a person with disabilities, over the age of forty, for whom this vehicle was his only means of attending medical appointments and maintaining employment.

280. Sedgwick did not exercise independent human review of the CCC ONE® output: it did not challenge the non-local comparable vehicles sourced from Richmond, Virginia and Grand Rapids, Michigan; it did not independently verify whether the condition adjustment was supported by the appraisal findings, which rated the vehicle's mechanical, body, paint, and tire condition as only "Moderate Wear"; and it did not adjust the automated output to reflect the particular circumstances of Mr. Kenny's claim. Instead, it presented the CCC ONE® valuation as a final number and conditioned payment of that number on a complete waiver of all remaining claims.

281. To the extent Sedgwick's reliance on CCC ONE® — including its application of standardized, non-individualized downward adjustments, its selection of non-local comparable vehicles sourced from Richmond, Virginia and Grand Rapids, Michigan, and its adoption of the automated output without independent human review — operated to suppress the value of Mr. Kenny's claim and to deny him compensation to which he was legally entitled, such reliance constitutes discrimination on the basis of disability and age in violation of W. Va. Code § 5-11-9(7)(A), and subjects Sedgwick to liability for compensatory, emotional-distress, and punitive damages, together with attorneys' fees and costs.

282. To the extent discovery confirms that Sedgwick's use of CCC ONE® or similar automated valuation systems disproportionately affected individuals with disabilities, older individuals, or other protected groups — whether through standardized algorithmic adjustments, non-local comparable selection, or the systematic substitution of software output for individualized appraisal — such conduct constitutes unlawful discrimination under the West Virginia Human Rights Act.

**F. Damages**

283. As a direct and proximate result of Sedgwick's discriminatory conduct, Mr. Kenny suffered actual damages including: denial of legally recoverable loss of use compensation for an extended period; denial of legally recoverable annoyance and inconvenience compensation; denial of full reimbursement for rental and replacement vehicle expenses; prolonged deprivation of reliable transportation that interfered with his ability to receive medical care and required him to walk to chiropractic appointments while injured; financial hardship as the sole provider of his household; and emotional distress, anxiety, and frustration arising from Sedgwick's exploitation of his disability-driven economic vulnerability.

284. Sedgwick's conduct was willful, malicious, and in reckless disregard of Mr. Kenny's rights under the West Virginia Human Rights Act.

285. That conduct warrants an award of punitive damages.

286. Plaintiff is entitled to all remedies available under the West Virginia Human Rights Act, including compensatory damages, emotional distress damages, attorneys' fees and costs, and punitive damages where authorized by law.

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests judgment against Defendant Sedgwick Claims Management Services, Inc. for compensatory damages including all economic losses and emotional distress damages; for punitive damages; for attorneys' fees and

costs as authorized by the West Virginia Human Rights Act; for pre-judgment and post-judgment interest; for a trial by jury on all issues so triable; and for all other just and proper relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Paul B. Kenny respectfully requests that this Court:

a. Enter judgment in his favor and against all Defendants, jointly and severally as applicable;

b. Award compensatory damages in all categories described herein, in an amount to be determined at trial;

c. Award punitive damages against Defendants Salimin and EVAZ PRIME based on their reckless, willful, and wanton conduct;

d. Award compensatory damages, emotional distress damages, punitive damages, attorneys' fees, and costs against Defendant Sedgwick Claims Management Services, Inc. pursuant to the West Virginia Human Rights Act;

e. Award pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Award costs of this action, including court costs and expert witness fees;

g. Award reasonable attorneys' fees to the extent permitted by law; and

h. Grant such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,

**PAUL B. KENNY**,
By Counsel,

/s/ George N. Sidiropolis
George N. Sidiropolis, Esq. (WV Bar #10391)
**THE INJURY RIGHTS LAW FIRM, PLLC**
1140 Main Street, 4th Floor
Wheeling, West Virginia 26003
Phone: (304) 233-7766
george@injuryrightsfirm.com

*Attorney for Plaintiff*